**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

GEORGE JOHNSON,

                                        Petitioner,

                - v -                                           Civ. No. 9:03-CV-1189
                                                                    (LEK/RFT)

JAMES J. WALSH,

                                        Respondent.

**APPEARANCES:**                                 **OF COUNSEL:**

GEORGE JOHNSON
Petitioner, *Pro Se*
00-A-4346
Attica Correctional Facility
Box 149
Attica, New York 14011-0149

HON. ANDREW M. CUOMO                              MICHAEL G. MCCARTIN, ESQ.
Attorney General for the State of New York        Assistant Attorney General
Attorney for Respondent
The Capitol
Albany, New York 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER**

*Pro se* Petitioner George Johnson was convicted by a jury of two counts of second degree

murder, three counts of burglary in the first degree, three counts of robbery in the first degree, one

count of robbery in the second degree, and one count of arson in the third degree.  Trial Transcript of

George Johnson, dated May 31-June 27, 2000 ("Trial Tr.") at pp. 3692-94.  On August 1, 2000,

Petitioner was sentenced to the following: 1) for each count of murder in the second degree, an

indeterminate term of twenty-five (25) years to life imprisonment; 2) for each count of burglary in the

first degree and robbery in the first degree, a determinate term of twenty-five (25) years imprisonment;

3) for robbery in the second degree, a determinate term of fifteen (15) years imprisonment; and 4) for

arson in the third degree, an indeterminate term of five (5) to fifteen (15) years imprisonment.

Sentencing Tr., dated Aug. 1, 2000, at pp. 53-54.  The sentence on the two counts of murder in the

second degree, one count of burglary in the first degree, two counts of robbery in the first degree, and

arson in the first degree were to run consecutively, thus, culminating in an aggregate term of eighty (80)

years to life.  *Id.* at pp. 54-55.  However, under New York law, Petitioner was eligible for an automatic

reduction and therefore, was sentenced to an aggregate term of imprisonment of fifty (50) years to life.

*See* N.Y. PENAL LAW § 70.30(1)(e)(viii); *People v. Johnson*, 757 N.Y.S.2d 349, 351 n.2 (N.Y. App.

Div. 3d Dep't 2003).  Petitioner presently seeks a Writ of *Habeas Corpus* pursuant to 28 U.S.C. § 2254

on the following grounds: 1) there was insufficient evidence to support the convictions; 2) the trial

court improperly instructed the jury regarding the voluntariness of his oral and written statements; 3)

the trial court erred by failing to suppress Johnson's oral and written statements; and 4) the trial court

erred by denying his motion to vacate after a witness recanted his testimony.  Dkt. No. 1, Pet. at ¶ 13.[1]

For the reasons to follow, it is recommended that the Petition be **DENIED**.

## I. BACKGROUND

On November 4, 1999, Petitioner was indicted on two counts of second degree murder, three

counts of burglary in the first degree, three counts of robbery in the first degree, one count of robbery

in the second degree, attempted arson in the first degree, and arson in the second degree.  R.A.,

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636 and N.D.N.Y.L.R. 72.

Indictment, dated Nov. 4, 1999, at pp. R6-11.[2]  The indictment alleged that Petitioner, acting alone or with others, caused the deaths of Matilda Montenaro and Lois Dimaria during the course of committing or attempting to commit robbery, burglary, and/or arson on December 16, 1998.  *Id.*

Beginning on February 7, 2000, and continuing intermittently until its conclusion on March 16, 2000, the trial court held a lengthy *Dunaway/Wade/Huntley* Hearing.[3]  *See* Hr'g Tr., dated Feb. 7, 8, 10, & 18, 2000 & Mar. 6 & 16, 2000.  The first witness to testify at the Hearing was Investigator John Sims of the Schenectady Police Department.  *Id.* at p. 11.  He stated that between August and October 1999, he became aware of information provided by Megan Monteleone and Elsie Ottendorf concerning the whereabouts of Petitioner as well as the events occurring on the night of the murders.  *Id.* at pp. 38-46.

Monteleone told Sims that she was friends with Petitioner and two days after the murders occurred, Petitioner had fled the area.  *Id.* at p. 40.  In an oral statement taken on August 12, 1999, Ottendorf indicated that Petitioner had contacted her by telephone asking if he could stay with her.  *Id.* at pp. 44-52. Ottendorf stated that during her conversation with Petitioner, he inquired whether she had heard anything about the incident, to which she responded that two other men had been  questioned.  *Id.* at p. 53.  She further told Sims that Petitioner stated the following: 1) one of the men questioned had nothing to do with the incident; 2) Petitioner was at the victims' home and, along with Aaron Umber and Vincent O'Connor (a/k/a "Dusty"), robbed them of some jewelry; 3) one of the women was in the

---

[2] R.A. refers to the Record on Appeal, dated July 22, 2002, filed by Petitioner to the New York State Appellate Division, Third Department.

[3] A *Dunaway* Hearing determines whether probable cause existed for a criminal defendant's arrest, *see Dunaway v. New York*, 442 U.S. 200 (1979); a *Wade* Hearing determines whether the pretrial identification of a criminal defendant resulted from impermissibly suggestive law enforcement procedures, *see United States v. Wade*, 388 U.S. 218 (1967); and a *Huntley* Hearing determines the voluntariness of inculpatory statements made by a criminal defendant to law enforcement officers, *see People v. Huntley*, 204 N.E.2d 179 (N.Y. Ct. of App. 1965).  Because Petitioner does not challenge the pretrial identification procedures, the Court will not discuss the portions of the proceeding relating to the *Wade* Hearing.

living room bleeding from the head; and 4) because Umber had already been arrested for the crimes, he was waiting to see what Umber's sentence would be before he went to the police. *Id.* at pp. 56-57. Sims testified that Petitioner's rendition of the events to Ottendorf was consistent with the crime scene in terms of the robbery and homicides. *Id.* at pp. 57-58.

Sims also testified that he was in contact with Petitioner's girlfriend, Connie Maier, who told him that Petitioner, Umber, and O'Connor were all friends. *Id.* at p. 64. Maier also confirmed that Petitioner left New York after the murders and relayed that he wished to return to Schenectady. *Id.* at pp. 69-70. Sims further testified that jailhouse informants provided information that Umber named Petitioner as an accomplice in the crimes and detailed how the crimes had taken place. *Id.* at pp. 83-86. Sims also received information regarding the incident from Pasquale Nicolella, who owned the house next door to the two victims. *Id.* at pp. 90-98.

After following several unsuccessful leads and chasing Johnson across numerous state lines, Johnson's whereabouts were ultimately confirmed when a call he made was traced to a motel room located in Alabama. *Id.* at pp. 126-27. Officer Robert McHugh of the Schenectady Police Department and Sims, who in tracking Johnson's whereabouts had previously enlisted the aid of the Meridian, Mississippi Police Department, traveled to Alabama with the intent of taking Johnson back to Meridian and then to New York. After reaching Alabama and spotting Petitioner coming out of the motel, Sims approached him, faked a southern accent to throw him off, and asked him about a restaurant. *Id.* at pp. 134-39. Once Petitioner was engaged, Sims "put [him] down on the ground." *Id.* Sims handcuffed Petitioner in the presence of two other officers, put him in a Meridian officer's car, and waited for Alabama Sheriff Johnny Isaac. *Id.* at pp. 141-43. They left Petitioner in the car alone, did not interrogate him, and let him go to the bathroom. Sheriff Isaac arrived thirty-five minutes later. *Id.* at

pp. 144-46.  Sims admitted Petitioner was in custody from the time he was handcuffed in Alabama and that he was not free to leave.  *Id.* at p. 250.

Sims wanted to take Petitioner back to Meridian but Sheriff Isaac wanted to talk to Petitioner first.  *Id.* at p. 147.  Sims heard Isaac ask Petitioner if he wanted to stay in Alabama or would he be willing to return to Meridian; Petitioner volunteered to go to Meridian.  *Id.* at pp. 148-50.  Before returning to Mississippi, the officers allowed Petitioner to retrieve his belongings from the motel.  *Id.* at pp. 152-54.  Sims testified that neither he nor any other officer questioned or interrogated Petitioner regarding the murders from the time Petitioner was handcuffed until they reached the Meridian police station.  *Id.* at pp. 155-56 & 255.  Additionally, no *Miranda* warnings were administered from the time Petitioner was taken into custody in Alabama until approximately one and one-half hours later when they reached the Meridian police station.  *Id.* at pp. 245 & 255.  Upon arriving at the Meridian police station, Petitioner went to the bathroom, was taken to an interview room, and had a handcuff placed on one hand with the other attached to a table.  *Id.* at pp. 156-57.  Sims and another officer then retrieved some food and cigarettes for Petitioner.  *Id.*

After getting settled in Meridian, Officer McHugh orally administered *Miranda* warnings to Petitioner and Petitioner initialed the left-hand side of the *Miranda* form.  *Id.* at pp. 159-62; *see also* Advice of Rights Form, dated Oct. 8, 1999, at p. RA-143.  According to Sims, Petitioner was only questioned about the murders subsequent to the reading of the *Miranda* warnings and Petitioner waived his right to have an attorney present.  Hr'g Tr. at p. 166; Advice of Rights at p. RA-143.  Sims testified that after several hours of questioning, Petitioner admitted his involvement in the crimes and provided a written statement to that effect.[4]  Hr'g Tr. at pp. 166-69, 172 & 197; Admission, dated Oct. 9, 1999,

---

[4] Initially during questioning, Petitioner denied his presence at the scene, but after he was told that his statements as to his whereabouts were contradicted by others, he admitted he was present.  Hr'g Tr. at pp. 193-95.

at pp. RA-149-56.  In addition to the statement, Petitioner drew a sketch detailing how he and the others used a ladder to enter into the victims' home.  Hr'g Tr. at pp. 184-86; Admission at p. RA-156.

Sims testified that no threats nor promises were made to Petitioner, Petitioner never asked for an attorney nor for the questioning to cease, and Petitioner was fully awake and responsive during questioning.  Hr'g Tr. at pp. 189-91.  Sims noted that at the time the admissions were made, there were no charges pending nor warrants issued in Schenectady.  *Id.* at p. 198.  Once the statement was completed, Sims stated it was faxed to Judge Karen Drago in Schenectady in order to obtain a warrant of arrest.  *Id.* at pp. 199-203.[5]

Next, Sergeant Buzanowski testified that after receiving a fax about Petitioner's statement, he went to Judge Drago's home to get a warrant.  *Id.* at pp. 447-48.  Buzanowski stated he obtained the warrant, filed the felony complaint previously given to him, and faxed it back to Sims and McHugh in Mississippi.  *Id.* at pp. 448-49.  Thereafter, Sheriff Isaac testified, confirming he had first been contacted by police officers from Mississippi concerning Petitioner's location and he told the officers he would meet them as soon as possible.  *Id.* at pp. 476-77.  Isaac testified that he gave the officers the authorization to apprehend Petitioner.  *Id.* at p. 479.  He then reaffirmed that Petitioner had voluntarily decided to return to Mississippi with the other officers and her personally questioned Johnson as to whether he had been threatened, coerced, or anything of the like, to which Petitioner answered in the negative.  *Id.* at pp. 486-91.

Subsequently, Judge Drago testified that prior to McHugh's departure to Mississippi, he approached her and stated that an undated complaint existed against Petitioner and she may be called

---

[5] Sims also testified that he and McHugh were provided with a manilla envelope from the Meridian officers prior to their departure from Mississippi, which contained a fugitive warrant, but neither of them looked in the envelope and were not made aware of the warrant until questioned by the district attorney's office a few weeks prior to the Hearing.  Hr'g Tr. at pp. 424-33.

upon to issue the warrant after further investigations were completed in Mississippi. *Id.* at pp. 555-56. Judge Drago stated she reviewed the complaint, prepared a warrant of arrest without a signature so that the paperwork would be ready, and thereafter signed the warrant when Sergeant Buzanowski came to her house early in the morning on October 9, 1999. *Id.* at pp. 556-59. Following Judge Drago's testimony, McHugh was the last witness to testify at the Hearing whereupon he confirmed the testimony provided by Sims and Judge Drago. *See generally id.* at pp. 592-612.

On May 9, 2000, the trial court issued its ruling. Decision and Order on Suppression Mot., dated May 9, 2000. In regards to Petitioner's statements and to when the right to counsel attached, the court stated that under New York law, the right had not attached until the felony complaint was filed, which was after Petitioner had provided his statement, and that in any event, Petitioner had waived his right to counsel. *Id.* at pp. 7-8. The court discussed the effect of the delay in filing the accusatory statement and whether this made the waiver invalid. *Id.* at p. 20. The court held that while there was a delay because Sims and McHugh were seeking sufficient evidence from which they could obtain an indictment, any imperfections in the procedures used by the police did not rise to the level to implicate Petitioner's right to counsel and no constitutional violations occurred. *Id.* at pp. 20-21.

The court further addressed Petitioner's contention that he was unlawfully arrested and transported without probable cause. *Id.* at pp. 14-21. The court noted that from the moment he was handcuffed, Petitioner was "in custody." *Id.* at pp. 16-17. The court grappled with the fact that under Alabama law, the only way for Sims and McHugh to take Petitioner into custody was as private citizens who would then have to turn Petitioner over to the police shortly thereafter, at which time a ticket would be issued and bail set or he would go before a judge within seventy-two hours. *Id.* at pp. 17-18. However, these procedures were not followed and Sheriff Isaac allowed Sims and McHugh to transport

Petitioner, while handcuffed, out of the state, though it seems Petitioner voluntarily did so. *Id.* at pp. 18-19. The court held that even if the legality of Petitioner's detention is questionable, the determination of whether his statements should be suppressed was based on attenuation. *Id.* The court found that Petitioner's detention was followed by approximately a thirty-minute period waiting for the Sheriff and then an hour long trip back to Mississippi and that the testimony by the witnesses concerning the procedures followed after returning to Mississippi were consistent with a voluntary and admissible statement. *Id.* at p. 19. The court stated that *Miranda* warnings were given more than once, he was not questioned for a prolonged period, he was given food, drinks, and bathroom breaks, no physical force was used to obtain the statement, and Petitioner never requested a lawyer. *Id.* at pp. 19-20. Thus, the motion to suppress was denied. *Id.* at pp. 19-21.

Subsequently, on June 5, 2000, the trial commenced. Vincent Polsinelli, the Deputy Chief of the Schenectady Fire Department, testified that on December 16, 1998, at approximately11:43 p.m., a 911 call was received from a private alarm company for a house resided in by two older ladies. Trial Tr. at pp. 966-67. The fire department arrived on the scene and began a search of the perimeter of the home. *Id.* at pp. 967-69. Polsinelli testified that they attempted to get in but all the doors and windows were locked. *Id.* at 970-76. At that time, Nicolella, who lived next door, approached the firefighters stating he would call the ladies; when he attempted to call, however, there was no response. *Id.* After smelling natural gas, firefighters obtained entry into the home through a second floor window that was found open. *Id.* at pp. 976-79 & 986.[6] Once in the house, Polsinelli testified there was a fire in the second floor dining room, it was extinguished, then one of the other firefighters found a woman's body

---

[6] Firefighter Joseph Krawiecki testified that once inside the house, he and others turned off the gas line attached to the stove from where the gaseous odor originated. Trial Tr. at p. 1230. He further stated that he noticed candles on top of the stoves which did not seem to be lit at the time. *Id.* at pp. 1230-31.

on the first floor. *Id.* at pp. 979-81. As a result of finding the body, the police department was called. *Id.* at pp. 981-83. Shortly after the police arrived, another firefighter found another body on the second floor. *Id.* at pp. 983-85.

Later, Detective Van Stathis of the Schenectady Police Department testified about his photography of the crime scene. *Id.* at pp. 1251-66. Stathis detailed how most of the house was neat and clean though some parts of the house were disturbed and disarrayed as if someone had rifled through the house. *Id.* Detective Stathis further described the photographs taken of the windows between the victims' home and Nicolella's home next door since it was alleged that the participants in this crime entered the victims' home by crossing a ladder placed between the two homes. *Id.* at pp. 1342-55. Next, Dr. Barbara Wolf, a medical examiner and forensic pathologist, testified. *Id.* at p. 1428. Dr. Wolf concluded that there were no defensive marks on either victim to indicate that a struggle took place, there were tears to the backs of their heads that went all the way down to their skulls, and the causes of death for both women were blunt force traumas to the heads. *Id.* at pp. 1439-73.

Thereafter, Edward Stover testified. *Id.* at p. 1481. Stover stated that he, Aaron Umber, and Petitioner were friends and that he and Petitioner had a sexual affair. *Id.* at pp. 1481-90. According to Stover, he and Petitioner discussed the incident on two separate occasions. *Id.* at p. 1491. The first discussion took place in late December 1998 when Stover was at the grocery store and saw Petitioner. *Id.* Stover testified that Petitioner looked nervous and when he inquired what was wrong, Petitioner asked if he heard about the incident and told Stover that he was there at the time the murders occurred. *Id.* at pp. 1491-92. Stover also indicated that Petitioner seemed to have more money on him around this time than normal. *Id.* at pp. 1494-97. As for the second occasion, Stover stated that in mid-April

1999, Petitioner came to his house and after they had sex, Petitioner told him that Umber and O'Connor stole money, jewelry, and other belongings from the old ladies. *Id.* at p. 1493. Stover noted that when he asked about Petitioner's role in the incident, Petitioner stated that if he told Stover, he would have to kill him. *Id.*

Next, Elise Ottendorf testified regarding a telephone discussion she had with Petitioner about the incident wherein Petitioner stated that he went to the victims' house intending to rob them and had pushed one of the women into a stand at which point she cut her head; he also indicated he took a silver ring. *Id.* at pp. 1543-46. Ottendorf noted that Petitioner also stated he was at the scene with Umber and O'Connor, and during the incident, Petitioner and Umber fought about leaving fingerprints in the house so he set fire to the home intending to get rid of the fingerprints. *Id.* at pp. 1544-45 & 1560-61. She further testified that Petitioner thought about turning himself into the police but was waiting to find out the sentence Umber would receive since Umber had already been arrested and pled guilty. *Id.* at p. 1567.

Subsequently, Aaron Umber testified. *Id.* at p. 1620. Umber began by stating he had been charged with the same crimes as Petitioner and that he pled guilty to those charges. *Id.* at pp. 1624-25. He noted he did not receive a reduction of any of the charges in exchange for the plea nor would his sentence decrease through his cooperation, though he hoped the sentencing court would reduce his sentence because of the cooperation.[7] *Id.* at pp. 1625-29. Umber testified that he was at the victims' home with Petitioner as well as O'Connor. *Id.* at pp. 1631 & 1634-35. Umber noted that Nicolella assisted in the planning of the crimes but was not in the house during the incident. *Id.* He stated he became friends with Petitioner approximately two years prior to the incident, they had smoked

_____

[7] Umber testified that as a result of the plea, he would receive a sentence of an indeterminate term of imprisonment of forty (40) years to life. Trial Tr. at p. 1627.

*-10-*

marijuana together, and that he, his wife, and Petitioner had a threesome. *Id.* at pp. 1635-37.

In regards to the incident in question, Umber testified that the planning began two days before the murders while he, Petitioner, and O'Connor were doing drugs. *Id.* at p. 1644. Umber stated that Petitioner initiated the idea to break into the victims' home to get some money and that he went along with the plan even though he had reservations. *Id.* at pp. 1644-52. The day before the incident, the three men went to Nicolella's house to get some free crack. *Id.* at pp. 1653-54. From the front steps of Nicolella's home, they "cased" out the victims' home. *Id.* at pp. 1656-57. Umber testified that on the day of the murders, because they could find no other way of entry, he decided that one way to get into the home was to place a ladder between the windows of Nicolella's home and that of the victims. *Id.* at pp. 1658, 1660-61 & 1666. Later, he described this "ladder theory" to Petitioner, O'Connor, and Nicolella and they agreed it was a good idea. *Id.* at pp. 1676-77. They tied towels at one end of the ladder to prevent any marks from the ladder getting on the windowsills. *Id.* at p. 1680. The men grabbed three duffle bags from Petitioner's residence, found the ladder and put it out the window from Nicolella's window to the victims' upstairs window, and then crawled over the ladder into the victims' house. *Id.* at pp. 1681-86.

Once in the home, Umber and Petitioner went downstairs while O'Connor stayed upstairs. *Id.* at pp. 1687-88. While downstairs, Umber found a tan purse and started going through it when he heard a woman scream. *Id.* at p. 1688. Petitioner grabbed the woman and while Petitioner held her, Umber punched her in the face several times. *Id.* at p. 1689. Umber then hit the woman in the back of the head three times with a "pickle fork" and she stopped moving. *Id.* at pp. 1690-91. Afterwards, Umber and Petitioner went upstairs and began rummaging through the victims' belongings and placing some in their duffle bags. *Id.* at pp. 1691-93. Umber went back downstairs and saw O'Connor come down the

stairs with some guns.  *Id.* at pp. 1694-96.  Umber then went back up the stairs to the attic to get a bag that was left and saw another lady lying face down on the floor with a head wound and concluded she was dead.  *Id.* at pp. 1696-97.  Once the bags were collected, the three men left through the second floor window, exited Nicolella's home, and went back to Petitioner's house where Umber and O'Connor began to clean the blood off of themselves and their clothing; Petitioner did not have any blood on his clothes.  *Id.* at pp. 1698-1702.

Once clean, Umber began to worry about the two bodies and decided they should set the house on fire by turning on the gas stoves and sparking a flame.  *Id.* at pp. 1702-03.  Though Petitioner and O'Connor did not like that plan, Umber testified that he stayed while Petitioner and O'Connor went back to the victims' house to set the fire.  *Id.* at pp. 1704-05.  After approximately a half hour had passed, Petitioner and O'Connor returned and told him they lit a candle and turned on the gas stove.  *Id.* at pp. 1710-11.  Umber became upset because the candle would probably not create a fire.[8]  *Id.* at pp. 1711-12.  He then left, taking one of the duffle bags with him.[9]  *Id.*

Umber testified that a few months later, he was arrested on unrelated charges and after he was released from the Schenectady Jail, he made some admissions to one of his wife's friends about the murders.  *Id.* at pp. 1719-29.  A short time later, Sims and McHugh arrested and then *mirandized* him.  *Id.* at pp. 1729-33.  At first, Umber denied knowing anything about the murders, but after he heard a tape of his admissions, he told the officers he was at the scene for a brief time but he was not there

---

[8] Fire Investigator Lawrence Colleton later testified that a candle was found on a table near the stove and the candle was nearly burnt all the way down to just the wick.  Trial Tr. at pp. 2215-17.  He further noted several other candles were also found near the vicinity of the stove that looked as they had been previously lit.  *Id.* at pp. 2217-31.

[9] Umber subsequently testified he tried to sell the stolen items and whatever items were not purchased, he gave as a present to Susan Palmer for Christmas.  Trial Tr. at pp. 1712-17.  Palmer later testified that she received from Umber certain items stolen from the victims' house.  *Id.* at pp. 2283-86.

when the victims were murdered.  *Id.* at pp. 1734-37.  Umber continued to lie to the police about the events of the night and provided names of people whom he knew were never near the scene.  *Id.* at pp. 1737-50.  After approximately twelve hours of interrogation, Umber gave the police a false statement, which did not implicate Petitioner in the crimes.  *Id.* at pp. 1740-45.  A few days later, Umber was charged with the murders.  *Id.* at p. 1758.  Once in jail, Umber recanted his statement that he was at the scene all together because he was scared of the death penalty, but later pled guilty when he found out the death penalty would not be part of his sentence.  *Id.* at pp. 1760-61.  Before his plea and while he was still in jail, Umber made statements to other inmates about the role Petitioner and O'Connor played in the murders and minimized his own involvement.  *Id.* at pp. 1756-66 & 1770-72.  Umber then testified that he blamed O'Connor for both killings but after he pled, he confessed to one of the murders to "get it off [his] chest[.]"  *Id.* at pp. 1772-73.

Later, after Petitioner made his admissions and was arrested, Umber and Johnson were placed in the same jail in cells located across from each other.  *Id.* at pp. 1786-90.  The two men discussed some of Petitioner's statements made to the police, which had implicated Umber.  *Id.*  Subsequently, several months after Petitioner was arrested, on or about March 17, 2000, on the eve of Umber's trial, Umber plead guilty.  *Id.* at pp. 1796 & 1814.

Officer McHugh then testified and confirmed the story of how Umber was caught and lied to the police several times when providing his statement.  *Id.* at pp. 1935-53.  McHugh went on to testify about how Petitioner was caught in Alabama as described by Officer Sims during the *Dunaway/Wade/Huntley* Hearing as well as Petitioner's confession.  *Id.* at pp. 1966-2041 & 2057-115.[10] Subsequently, Jamie Faye, Petitioner's cousin through marriage, testified.  *Id.* at pp. 2351-55.  Faye

---

[10] Officer Sims also testified and provided roughly the same testimony as given in the *Dunaway/Wade/Huntley* Hearing.  *See generally* Trial Tr. at pp. 2429-2596.

testified that he was incarcerated at the Schenectady Jail at the same time Petitioner was in there.  *Id.* at pp. 2355-56.  Faye stated the two began talking and the subject of the murders was initiated by another inmate at which point Petitioner stated that he "did it."  *Id.* at pp. 2356 & 2363-64.

After a few more witnesses testified, the prosecution rested its case and the defense presented its witnesses.  *Id.* at p. 2596.  Several witnesses who were customers of Nicolella's hair cutting business testified.  *See generally id.* at pp. 2635-73, 2733-67 & 2831-50.  According to such witnesses, on the night in question, they went to get their hair cut at Nicolella's home in the evening hours and never saw Petitioner, Umber, nor O'Connor come into Nicolella's house.  *Id.*  Nicolella's cousin, Charlene Palumbo, and mother, Elizabeth Nicolella, who both lived in the house with Nicolella at that time, also testified that they did not see Petitioner, Umber, nor O'Connor on the evening of December 16, 1998.  *See generally id.* at pp. 2677-725 & 2767-829.

Thereafter, Petitioner testified.  *Id.* at p. 2988.  Petitioner first testified about the circumstances surrounding his arrest.  *Id.* at pp. 2988-91.  After returning to Mississippi, Petitioner stated he was told to initial the form containing the *Miranda* warnings but he did not know what he was signing since it was not read to him.  *Id.* at pp. 2992-93.  Petitioner stated he requested an attorney at the time he was handcuffed but the police officers told him he would have to wait.  *Id.* at pp. 3001-02.  He further noted that even though he had been arrested on previous occasions for different crimes, he did not know or understand *Miranda* warnings.  *Id.* at pp. 3052-56. Once the interrogation began, Petitioner stated the officers relayed to him that they had several statements that would convict him for the murders of the two old ladies and the officers showed him pictures of the scene.  *Id.* at pp. 2993-96.  He testified that he was informed of Umber's statement of how the incident occurred.  *Id.* at pp. 2996-97.  Further, the officers told Petitioner if he provided information about his role in the murders, he would only be

charged with burglary and get five to ten years, but if he did not talk, he would never see his child again. *Id.* at pp. 2999-3000.

Petitioner testified that for the first two and one-half hours of interrogation, he denied any involvement, but then he got scared and said he was at the victims' house though he did not kill either of the two ladies. *Id.* at pp. 3000-03. Petitioner stated that the police officers forced and duped him into making admissions through their leading questions and that he was told where to put the ladder in the drawing he created even though he had not committed any crime. *Id.* at pp. 3005-14 & 3036-37. He stated he was never at the victims' house on December 16, 1998, and only learned of the case because his grandmother told him about it. *Id.* at pp. 3015-16 & 3036-37. Petitioner further testified that he was not good friends with Umber nor O'Connor and did not see them on the night in question. *Id.* at pp. 3017-23. Petitioner also stated that at no time did he confess to committing any crime in front of Ed Stover or his cousin, Jamie Faye. *Id.* at pp. 3030-32.

After the conclusion of Petitioner's testimony and that of a few rebuttal witnesses, the court conducted a charge conference with the attorneys. *Id.* at pp. 3226-3335. Within this conference, there was a heated debate about a charge relating to Petitioner's confession and how the jury should consider the admissions. *See generally id.* at pp. 3274-3335. The New York Criminal Jury Instructions ("CJI") in regards to the voluntariness of Petitioner's statements included a second prong that involved determining whether the admission was made truthfully. *Id.* The prosecution argued that New York's Criminal Procedure Law did not include the "truthfulness" portion of the charge and the defense argued that the entire CJI on this charge should be given to the jury because that was the practice of the courts. *Id.* After contemplating this charge, the court stated it would only charge as to voluntariness and not truthfulness. *Id.* at pp. 3334-35. The defense and prosecution then provided their summations and the

court charged the jury.  *Id.* at pp. 3338-654.  The trial court thoroughly explained to the jury how to make credibility determinations of the witnesses who testified, the weight to be given to oral and written statements made to the police if such statements were given voluntarily, as well as how to determine if Petitioner knowingly, freely, and intelligently waived his right to be silent and to have counsel.  *Id.* at pp. 3585-611.  Subsequently, the jury returned their verdict and found Petitioner guilty of two counts of second degree murder, three counts of burglary in the first degree, three counts of robbery in the first degree, one count of robbery in the second degree, and one count of arson in the third degree.  *Id.* at pp. 3692-94.

Judgment was entered by the Oneida County Court and, on June 30, 1998, Johnson was sentenced.  Petitioner thereafter filed a N.Y. CRIM. PROC. LAW § 440.10 motion to vacate his sentence on the ground that after the trial was completed, Umber recanted his testimony in an affidavit stating he was subjected to duress and testified falsely.  *See* 440 Mot. Hr'g, dated Dec. 19, 2000.  Specifically, Umber claimed that the prosecution threatened that his plea bargained sentence would be voided and he would be subjected to a sentence that included the death penalty if he did not continue in the trial to put forth the story about how a ladder was used to gain entry into the victims' home.  *Id.* at p. 14. The court denied the motion stating that Umber's recent affidavit was "unworthy of belief" when considering Petitioner's own confession as well as the testimony of other witnesses at trial.  Decision and Order, dated Feb. 8, 2001.

Subsequently, Petitioner filed a direct appeal of his convictions, which included an appeal of the decision rendered on his N.Y. CRIM. PROC. LAW § 440.10 motion, and the judgment was affirmed on appeal to the New York Supreme Court, Appellate Division, Third Department on March 27, 2003. *People v. Johnson*, 757 N.Y.S.2d 349 (N.Y. App. Div. 3d Dep't 2003).  Leave to appeal to the Court

of Appeals was denied on May 23, 2003.  *People v. Johnson,* 793 N.E.2d 419 (N.Y. Ct. of App. 2003).

This Petition followed.

## II.  DISCUSSION

### A.  Standard of Review

According to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

court may not grant *habeas* relief to a state prisoner claim unless the state courts adjudicated the merits

of the claim and such adjudication either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application
> of, clearly established Federal law, as determined by the Supreme Court of the United
> States; or (2) resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001); *see also Miranda v.
Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003).

The AEDPA also requires that in any such proceeding, "a determination of a factual issue made by a

State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Boyette*, 246

F.3d at 88 (quoting § 2254(e)(1)).

### B.  Sufficiency of the Evidence

Petitioner alleges that no rational relationship existed between the prosecution's theory and the

evidence, and thus, no rational trier of fact could have found the essential elements of the crimes

charged beyond a reasonable doubt.  Pet. at ¶ 13, Point II.  The Appellate Division found that the

evidence was legally sufficient to establish a *prima facie* case for all ten convictions.  *People v.

Johnson*, 757 N.Y.S.2d at 354-55.

A petitioner who challenges a conviction on the sufficiency of the evidence bears a "very heavy

burden."  *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d. Cir. 2002).  The Due Process Clause of the

Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he is charged. *See Fiore v. White*, 531 U.S. 225, 228-29 (2001); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979).  This inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).  A *habeas* petitioner claiming that there was insufficient evidence supporting the conviction is entitled to relief under 28 U.S.C. § 2254 only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. at 324; *see also Schlup v. Delo*, 513 U.S. 298, 323 n.38 (1995).  The reviewing court is required to consider the evidence in the light most favorable to the prosecution, and draw all inferences in its favor.  *Jackson v. Virginia*, 443 U.S. at 319.[11]  "When considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'"  *Ponnapula v. Spitzer*, 297 F.3d at 179 (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)).

In regards to all the charges for which Johnson was convicted, he may be criminally liable for the conduct of another when the other person "engages in conduct which constitutes an offense" and then "acting with the mental culpability required for the commission thereof, [Johnson] solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct."  N.Y. PENAL LAW § 20.00.  As noted previously, Petitioner was convicted of three counts of burglary in the first degree, three counts of robbery in the first degree, one count of robbery in the second degree and

---

[11] The *Jackson* standard is clearly established federal law as determined by the Supreme Court.  *See Huber v. Schriver*, 140 F. Supp. 2d 265, 276 n.5 (E.D.N.Y. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 114 (2d Cir. 2000)) (other citation omitted); *see also Santana v. Kuhlmann*, 232 F. Supp. 2d 154, 166-67 (S.D.N.Y. 2002).

arson in the third degree, as well as two counts of second degree murder.

> A person is guilty of burglary in the first degree when:
>
> he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein, and when, in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime . . . 2) [c]auses physical injury to any person who is not a participant in the crime; or 3) [u]ses or threatens the immediate use of a dangerous instrument[.]

*Id.* at §§ 140.30(2) & (3); *see also* R.A., Indictment at pp. R7-8.

Here, the evidence at trial showed that Petitioner, Umber, and O'Connor planned to break into the victims' home two days before the murders occurred with the intent to rob the victims of their money and possessions. *See* Trial Tr. at pp. 1644-52. On the day of the incident, Petitioner and his cohorts knowingly entered the victims' home by placing a ladder between a window from Nicolella's house to the victims' second floor window. *See id.* at pp. 1658, 1660-61, 1666, 1676-77, & 1680-86. Once inside the victims' home, Petitioner found one of the women and held her while Umber punched and hit her, causing physical injury. *See id.* at pp. 1439-73 & 1689-91; Admission. at pp. RA-149-56. Additionally, while Petitioner grabbed the woman, Umber used a dangerous instrument, the pickle fork, to hit the woman in the head three times, which ultimately led to her death. *See* Trial Tr. at pp. 1439-73 & 1689-91; Admission. at pp. RA-149-56. Based upon this evidence, as well as the fact that Petitioner acted with the requisite mental culpability and intentionally aided Umber and O'Connor in the commission of the crime, rational triers of fact could have found proof of Johnson's guilt beyond a reasonable doubt on the counts of burglary in the first degree since all the elements of the crime were established.

> In regards to the robbery counts, a person is guilty of robbery in the first degree when:
>
> he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: 1) [c]auses serious physical injury to any person who is not a participant in the crime; or . . . 3) [u]ses or

threatens the immediate use of a dangerous instrument[.]
N.Y. PENAL LAW §§ 160.15(1) & (3); *see also* R.A., Indictment at pp. R8-9.

Furthermore, a person is guilty of robbery in the second degree when "he forcibly steals property and when . . . [h]e is aided by another person actually present[.]" N.Y. PENAL LAW § 160.10(1); *see also* R.A., Indictment at pp. R9-10.   In this case, the evidence established that Petitioner, Umber and O'Connor, forcibly stole property from the victims and aided each other in doing so.  Trial Tr. at pp. 1439-73 & 1689-93; Admission at pp. RA-149-56.  Specifically, Petitioner, Umber, and O'Connor entered the victims' home with three duffle bags intending to take as many items as possible.  *See* Trial Tr. at pp. 1681-86, 1691-93, 1698-1702.  Once in the house, Umber found a tan purse and began rifling through it when he heard the scream of a woman, whom Petitioner subdued.  *Id.* at pp. 1689-91.  Then, as indicated within the burglary charge, Petitioner and Umber, in the course of forcibly stealing the victims' possessions, not only caused serious physical injury to one of the women when Petitioner held the woman and Umber punched her, but Umber also used a dangerous instrument, the pickle fork, and hit the woman on the back of the head three times, which caused her death.  *See id.* at pp. 1439-73 & 1689-91; Admission. at pp. RA-149-56.  Thereafter, Petitioner, Umber, and O'Connor rummaged through the victims' belongings and filled their duffle bags with the stolen items, including a silver ring taken by Petitioner.  Trial Tr. at pp. 1543-46, 1691-93, 1696-1702, 1712-17, & 2283-86.  Petitioner acted with the requisite mental culpability and intentionally aided Umber and O'Connor in the commission of the robbery.  Thus, reviewing the evidence in the light most favorable to the prosecution and drawing all inferences in its favor, rational triers of fact could find proof beyond a reasonable doubt on the robbery in the first and second degree counts since the elements of both charges were established at trial.

As for the arson charge, a person is guilty of arson in the third degree when "he intentionally

damages a building or motor vehicle by starting a fire or causing an explosion." N.Y. PENAL LAW §
150.10(1); *see also* Trial Tr. at pp. 3618 & 3639-40.   Here, testimony at trial showed that once
Petitioner, Umber, and O'Connor left the victims' home, Umber began to worry about any evidence
they may have left behind.  Trial Tr. at pp. 1702-03.  As a solution to their problem, Umber suggested
they set the victims' house on fire by turning on the gas stove and sparking a flame.  *Id.*  Once the plan
was in place, Petitioner and O'Connor intentionally returned to the victims' home, turned on the gas
stove, and lit some candles to ignite the house on fire.  *Id.* at pp. 1230-31, 1704-05, 1710-11, & 2215-
31.  As a result, the second floor dining room caught fire though firefighters were able to limit the
damage and prevent the rest of the house from being destroyed.  *Id.* at pp. 979-81.  Based on the
evidence adduced at trial and considering the evidence in favor of the prosecution, rational triers of fact
could find proof of Johnson's guilt beyond a reasonable doubt on the count of arson in the third degree
as all the elements were proven.

   Finally, in regards to the murder charges, a person is guilty of murder in the second degree
when:

> acting either alone or with one or more other persons, he commits or attempts to commit
> robbery, burglary, kidnapping [or] arson, . . . and, in the course of and in furtherance of
> such crime or of immediate flight therefrom, he, or another participant, if there be any,
> causes the death of a person other than one of the participants[.]

N.Y. PENAL LAW § 125.25(3); *see also* R.A., Indictment at pp. R6-7.

As thoroughly described above, Petitioner, acting with Umber and O'Connor, planned and knowingly
entered the victims' home in order to take their money and possessions and forcibly did so.  *See* Trial
Tr. at pp. 1439-73, 1644-52, & 1689-91; Admission. at pp. RA-149-56.  In the course of and in
furtherance of such crimes, namely burglary and robbery, Umber, with the aid of Petitioner, and

O'Connor caused the deaths of the two victims.[12]  Trial Tr. at pp. 1690-91 & 1694-97.  As previously stated, Petitioner held one of the women, who was found on the first floor of the house, while Umber hit her in the head with a pickle fork, causing her death, and O'Connor hit the other woman, who was found on the second floor, and caused her death.  *See id* at pp. 1689-91 & 1694-1702.  Based upon the record and drawing all inferences in the prosecution's favor, rational triers of fact could find proof of Johnson's guilt beyond a reasonable doubt on the murder charges since all the elements of this crime were established.

Thus, the Appellate Division's decision that the evidence presented at trial was legally sufficient to establish a *prima facie* case for all ten convictions was not contrary to, nor an unreasonable application of, clearly established federal law.

Therefore, it is recommended that the Petition be **denied** on the ground of insufficient evidence.

### C.  Jury Instruction

Petitioner claims that the trial court improperly instructed the jury as to the voluntariness of his oral and written statements by failing to charge the element of truthfulness.  Pet. at ¶ 13, Point I.  The Appellate Division held that although the suggested CJI contained a "truthfulness" provision regarding the voluntariness of statements rendered, New York law contains no such provision and thus, the omission of the "truthfulness" portion of the CJI charge was not in error.  *People v. Johnson*, 757 N.Y.S.2d at 353-54.  The Appellate Division further noted that because the trial court correctly instructed the jury on the standards to evaluate the credibility and weight of all witness statements, the omission of the "truthfulness" provision did not cause an error.  *Id.* at 354.

---

[12] There was no evidence provided at trial that Petitioner was the sole producing cause of either of the two women's deaths.  *See*  Trial Tr. at pp. 1689-91 & 1694-97; Admission at pp. RA-149-56.  Umber testified that Petitioner merely held one of the women while he beat her.  Trial Tr. at pp. 1689-91.

"[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  The Supreme Court has stated that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citations omitted).

A state prisoner claiming that the trial court provided "improper jury instructions faces a substantial burden." *DelValle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir. 2002).  In order to obtain a writ of *habeas corpus* in federal court for an error in a state court's jury instructions, a petitioner must "not only show that the instruction misstated state law but that the error violated a right guaranteed to him by federal law." *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) (citations omitted).  Stated another way, the Supreme Court has held that the court must determine "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, . . . not merely whether the 'instruction is undesirable, erroneous, or even universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)) (internal quotation marks omitted).  Furthermore, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. at 146-47 (citing *Boyd v. United States*, 271 U.S. 104, 107 (1926)).

As stated by the Appellate Division, the jury charge proposed by the CJI in regards to the voluntariness of a statement is the following:  "I now instruct you that even though the statement has been admitted into evidence and you are aware of its contents, you must give no weight whatsoever to the statement in arriving at your verdict unless you find, in accordance with my instructions, first that it was 'voluntarily made' and second, that it was 'truthful[.]'" *People v. Johnson*, 757 N.Y.S.2d at 353-

54 (quoting 1 CJI[NY] 11.01, at 656).  As noted by the Appellate Division, "this 'voluntariness' charge would require the jury to find a defendant's statement to be both voluntary and truthful before considering it as evidence or giving it any weight whatsoever."  *Id.* at 354.

Pursuant to N.Y. CRIM. PROC. LAW § 710.70(3), even if a petitioner's motion to suppress a statement is denied, a petitioner may still

> attempt[] to establish at a trial that evidence introduced by the people of a pre-trial statement made by him should be disregarded by the jury or other trier of the facts on the ground that such statement was involuntarily made[.]  [Thus,] the defendant may adduce trial evidence and otherwise contend that the statement was involuntarily made. In the case of a jury trial, the court must submit such issue to the jury under instructions to disregard such evidence upon a finding that the statement was involuntarily made.

No mention is made regarding the jury's consideration of the truthfulness of a statement.  *See* N.Y. CRIM. PROC. LAW § 710.70(3).  Instead, jury instructions need only encompass a determination of whether a petitioner's statement was made voluntarily.  *Id.*  Therefore, the trial court did not err when it failed to incorporate the complete CJI instructions to include the truthfulness portion.  Furthermore, the instruction involving Petitioner's statement did not so infect the entire trial that the resulting conviction violated due process.  Taking into account the overall jury charge given, which included extensive recitations on credibility determinations, the voluntariness of a statement, and whether rights were knowingly, voluntarily, and intelligently waived, there was no error committed that violated federal law.  Therefore, the Appellate Division's decision was not contrary to, nor an unreasonable application of, clearly established federal law.

Accordingly, it is recommended the Petition be **denied** on the ground of an error in the jury instructions.

### D.  Suppression

Petitioner claims that his oral and written statements should have been suppressed because he

was illegally seized and his right to counsel had attached prior to the police interrogation wherein the statements were made.  Pet. at ¶ 13, Point III.  The Appellate Division held that the "seizure" was proper since it was made as a citizen's arrest pursuant to Alabama law and that even if the arrest were deemed illegal, the record shows that the officers did not knowingly or intentionally deprive Petitioner of a statutory right.  *People v. Johnson*, 757 N.Y.S.2d at 351-53.  The Appellate Division further found that Petitioner's right to counsel did not attach at the time of questioning because no accusatory instrument had been filed in New York at the time, the Mississippi warrant did not constitute an accusatory instrument because it charged no crime, and even if the Mississippi warrant did trigger the right to counsel, Petitioner waived that right.  *Id.* at 352.

Under the AEDPA, a state court's factual findings at a suppression hearing are presumed to be correct, and the petitioner has the burden of overcoming that presumption by clear and convincing evidence.  *See Sorto v. Herbert*, 2004 WL 2852358, at *2  (E.D.N.Y. Dec. 13, 2004) (citing 28 U.S.C. § 2254(e)(1)); *James v. Walker*, 2003 WL 22952861, at *6 (E.D.N.Y. Aug. 28, 2003), *aff'd*, 2004 WL 2496742, at *6 (2d Cir. 2004) (unpublished opinion).  Notwithstanding the deference accorded to factual determinations, "legal questions, such as whether a defendant has effectively waived his federal constitutional rights in a proceeding, are governed by federal standards."  *Oyague v. Artuz*, 393 F.3d 99, 104 (2d Cir. 2004) (quoted in *Campbell v. Greene*, 440 F. Supp. 2d 141).

**1.  Fifth Amendment Right to Counsel**

The Fifth Amendment to the United States Constitution provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself[.]"  U.S. CONST. amend. V. In that context, pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966), "a person questioned by law enforcement officers after being taken into custody or otherwise deprived of his freedom of action in

any significant way must first be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444 (quoted in *Stansbury v. California*, 511 U.S. 318, 322 (1994)) (internal quotation marks omitted).  Under the Fifth Amendment, if a petitioner "in custody" exercises his privilege against self-incrimination and requests an attorney, then all questioning must cease in the absence of counsel.  *See generally Minnick v. Mississippi*, 498 U.S. 146, 150 (1990); *Arizona v. Roberson*, 486 U.S. 675, 677-82 (1988); *Edwards v. Arizona*, 451 U.S. 477, 484 (1981).  In determining whether an individual is considered "in custody" such that *Miranda* warnings are constitutionally required, courts are to consider whether a reasonable person would have believed he was at liberty to end the interrogation, taking into account the specific circumstances surrounding the subject questioning." *Campbell v. Greene*, 440 F. Supp. 2d 125, 140 (N.D.N.Y. 2006) (citing *Thompson v. Keohane*, 516 U.S. 99, 111 (1995)).  If there is a delay in administering *Miranda* warnings, the Supreme Court has held that "an initial failure to administer Miranda warnings, absent actual coercion or other circumstances calculated to undermine a suspect's free will, does not taint subsequent admissions made after the suspect has been fully advised of his Miranda rights and waives them." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985) (cited in *Duncan v. Fischer*, 410 F. Supp. 2d 101, 110 (E.D.N.Y. 2005).

Here, the trial court held a lengthy and very thorough combined *Dunaway/Wade/Huntley* Hearing and properly determined that Petitioner's statement should not be suppressed.  *See generally* Hr'g Tr; *see also supra* note 3.  In the Hearing, the police officers did not dispute the fact that once Petitioner was handcuffed in Alabama he was "in custody." Hr'g Tr. at p. 250.  No *Miranda* warnings were administered from the time Petitioner was taken into custody in Alabama until they reached the

Meridian police station, which was approximately one and one-half hours.  *Id.* at pp. 245-55.  Once at the Meridian police station, *Miranda* warnings were administered, Petitioner acknowledged that he was read his rights, and he waived his right to an attorney.  *Id.* at pp. 159-62 & 166; *see also* Advice of Rights Form at p. RA-143.  Although there was a delay in the administration of *Miranda* warnings, the officers did not question nor interrogate Petitioner about the murders or anything relating to the incident during the one and one-half hours.  *Id.* at pp. 155-56 & 255.  It was only after Petitioner was informed of his rights and waived such rights did Petitioner provide incriminating admissions and the drawing.  Hr'g Tr. at pp. 166-69, 172, 184-86, & 197; Admission. at pp. RA-149-56.  Furthermore, no promises nor threats were ever made to coerce Petitioner into providing the statements and at no time did he ever request an attorney.  Hr'g Tr. at pp. 189-91.  Thus, his right to counsel did not attach during this period under the Fifth Amendment because he effectively waived his right to an attorney and all statements taken by the police were proper.

Based on the evidence, the trial court correctly determined Petitioner's statements should not have been suppressed and the Appellate Division's decision was not contrary to, nor an unreasonable application of, clearly established federal law.

**2.  Sixth Amendment Right to Counsel**

The Sixth Amendment to the Constitution states, in part, that "[i]n all criminal prosecutions, the accused shall . . . have the assistance of counsel for his defense."  U.S. CONST. amend. VI.  This Sixth Amendment right to counsel attaches only after the initiation of adversarial judicial proceedings, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  *Kirby v. Illinois*, 406 U.S. 682, 688 (1972); *see also Leslie v. Artuz*, 230 F.3d 25, 32 (2d Cir.), *cert. denied*, 531 U.S. 1199 (2001); *United States v. Kon Yu-Leung*, 910 F.2d 33, 37-38 (2d Cir. 1990).

Federal courts, therefore, must examine state criminal procedural law to determine the commencement of adversarial judicial proceedings. *See Meadows v. Kuhlmann*, 812 F.2d 72, 77 (2d Cir.), *cert. denied*, 482 U.S. 915 (1987); *see also Kirby v. Senkowski*, 141 F. Supp. 2d 383, 397-98 (S.D.N.Y. 2001) (citing *Meadows*). Pursuant to New York State Criminal Procedure Law, criminal proceedings are commenced with the filing of an accusatory instrument, including, but not limited to, a felony complaint. *See* N.Y. CRIM. PROC. LAW § 100.05; *see also Meadows v. Kuhlmann*, 812 F.2d at 77. Courts in New York have also indicated that the right to counsel can attach at an arraignment or upon the issuance of an arrest warrant. *See Hemphill v. Senkowski,* 2004 WL 943567, at *8 (S.D.N.Y. May 3, 2004); *Kirby v. Senkowski,* 141 F. Supp. 2d at 398; *Gonzalez v. Sullivan*, 1990 WL 126189, at *1 (E.D.N.Y.), *aff'd* 934 F.2d 419 (1991).

Here, Petitioner's Sixth Amendment right to counsel did not attach at the time he made the oral and written statements. There was no formal charge, indictment, information, nor any other accusatory instrument filed and no preliminary hearing nor arraignment occurred until after the interrogation was completed and admissions were made. Additionally, the arrest warrant was not issued until after Petitioner's statement was faxed to officers in the Schenectady Police Department. *See* Hr'g Tr. at 198-203 & 447-49. Thus, the trial court's determination that the right to counsel had not attached and that the statements should not be suppressed was proper. *See* Decision and Order on Suppression Mot., dated May 9, 2000, at pp. 7-8. Furthermore, the Appellate Division's decision that the trial court's ruling was correct was not contrary to, nor an unreasonable application of, clearly established federal law.

To the extent Petitioner states that his right to counsel attached because the police delayed filing an accusatory document in order to obtain a confession, the Supreme Court has held that

> there is no constitutional right to be arrested.  The police are not required to guess at
> their peril the precise moment at which they have probable cause to arrest a suspect,
> risking a violation of the Fourth Amendment if they act too soon, and a violation of the
> Sixth Amendment if they wait too long.  Law enforcement officers are under no
> constitutional duty to call a halt to a criminal investigation the moment they have the
> minimum evidence to establish probable cause, a quantum of evidence which may fall
> far short of the amount necessary to support a criminal conviction.

*Hoffa v. United States*, 385 U.S. 293, 310 (1966) (quoted in *Grimes v. Goord*, 371 F. Supp. 2d 305, 317).

In analyzing this delay in conjunction with the voluntariness of the confession, courts have held that whether a petitioner was coerced into making his statements must be considered within the totality of the circumstances.  *See Grimes v. Goord*, 371 F. Supp. 2d at 317 (citing cases).  Considering the totality of the circumstances in this case, the right to counsel did not attach just because a delay occurred in the filing of an accusatory instrument, especially in light of the fact that there was no coercion and Petitioner waived his right to counsel.

### 3.  Fourth Amendment Right Against Illegal Seizure

Additionally, to the extent Petitioner asserts, as a basis to suppress his admissions, that his Fourth Amendment right was violated when he was illegally seized, his claim is foreclosed.  *See Stone v. Powell,* 428 U.S. 465 (1976) (cited in *Hernandez v. Filion*, 2005 WL 3164063, at *5-6 (S.D.N.Y. Nov. 29, 2005)); *see also Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992); *Campbell v. Greene*, 440 F. Supp. 2d at 138-39.  Pursuant to *Stone,* a petitioner is not entitled to *habeas* relief if the state courts provided "an opportunity for full and fair litigation" of a claim under the Fourth Amendment.  *Stone v. Powell*, 428 U.S. at 482.  Thus, a federal court may only review a claim based on the Fourth Amendment "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying

process." *Capellan v. Riley,* 975 F.2d at 70 (citing *Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir. 1977)); *Campbell v. Greene*, 440 F. Supp. 2d at 138 (citing *Capellan*).  New York law provides such a corrective procedure for Fourth Amendment claims in the form of a suppression hearing.  *See* CRIM. PROC. LAW §§ 710.10 *et seq.*; *see also Capellan v. Riley,* 975 F.2d at 70 n.1 (holding that "federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate"); *Campbell v. Greene*, 440 F. Supp. 2d at 138.

Here, as noted previously, Johnson was provided with a suppression hearing and he does not claim that he was precluded from a full and fair opportunity to litigate his Fourth Amendment claim that he was illegally seized.  The trial court thoroughly discussed the circumstances surrounding the arrest and made factual and legal determinations.  *See* Decision and Order on Suppression Mot. at pp. 14-22.  The Second Circuit has held that "once it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief." *Graham v. Costello,* 299 F.3d 129, 134 (2d Cir. 2002). Furthermore, a "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." *Capellan v. Riley*, 975 F.2d at 72.  Thus, because there is no evidence that the trial court failed to conduct a suppression hearing and address Petitioner's Fourth Amendment claim that he was illegally arrested, Petitioner's claim for relief should be denied.  *See Campbell v. Greene*, 440 F. Supp. 2d at 139-40 (citing, *inter alia*, *Morales v. Walsh*, 2003 WL 23185770, at *15 (E.D.N.Y. Oct. 30, 2003) (denying Fourth Amendment claims, including claim of unlawful arrest, under *Stone*)) (further citations omitted).

Therefore, it is recommended that the Petition be **denied** on the ground that Petitioner's

statements should have been suppressed because his right to counsel had attached and based on an

illegal seizure.

### E.  Motion to Vacate

Petitioner alleges that inasmuch as the prosecution's case rested on the ladder theory

"concocted" by Umber, which was later recanted and controverted by the evidence, the motion to

vacate should have been granted and a new trial ordered.  Pet. at ¶ 13, Point IV.  The Appellate

Division found this contention to be without merit.  *People v. Johnson*, 757 N.Y.S.2d at 355.

In order to fulfill the exhaustion requirement under the AEDPA, a claim may be "fairly

present[ed] to the state courts[,] . . . without citing chapter and verse of the Constitution," if there is:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on
> state cases employing constitutional analysis in like fact situations, (c) assertion of the
> claim in terms so particular as to call to mind a specific right protected by the
> Constitution and (d) allegation of a pattern of facts that is well within the mainstream
> of constitutional litigation.

*Daye v. Att'y Gen. of the State of New York*, 696 F.2d 186, 194 (2d Cir. 1982); *see also Smith v.
Duncan*, 411 F.3d 340, 348 (2d Cir. 2005).

Here, Petitioner failed to assert any violation of his federal constitutional rights or cite to any federal

cases when he briefed this claim on appeal to the Appellate Division.  *See* Pet., Ex. A, Appellate Br.

at p. 38.  Instead, Petitioner relied solely on state law citing to only one state decision, which did not

employ a federal constitutional analysis.  *Id.*  Furthermore, the motion to vacate is a product of state

law and is not within the mainstream of constitutional litigation.  *See* N.Y. CRIM. PROC. LAW § 440.10

.  Because Petitioner failed to raise this claim in the constitutional context at the state level, he is now

procedurally barred as he cannot now file a second appeal with the Third Department as to this claim

since a criminal defendant is "entitled to one (and only one) appeal" to the Appellate Division.  N.Y.

CRIM PROC. LAW § 450.10(1); N.Y. Ct. Rules § 500.10(a); *see also Aparicio v. Artuz*, 269 F.3d 78, 91

(2d Cir. 2001).

The Court's review of the substance of this procedurally defaulted claim is therefore conditioned upon Petitioner demonstrating cause for his default and resulting prejudice, or presenting evidence to show that he is "actually innocent" of the crime of which he was found guilty.[13] *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Ramirez v. Attorney Gen. of the State of New York*, 280 F.3d 87, 94  (2d Cir. 2001); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (citing *Coleman*); *Strogov*, 191 F.3d at 193-94; *King v. Greiner*, 210 F. Supp. 2d 177, 182 (E.D.N.Y. 2002) (stating the court is precluded from considering unexhausted claims "unless petitioner can establish cause to excuse the default and prejudice, or actual innocence").

To establish legal cause for his or her procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with New York's procedural rules. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Restrepo v. Kelly*, 178 F.3d 634, 638 (2d Cir. 1999). Examples of external factors include interference by officials, ineffective assistance of counsel, or that "the factual or legal basis for a claim was not reasonably available" at trial nor on direct appeal. *Murray v. Carrier*, 477 U.S. at 488.  Attorney ignorance or inadvertence is not cause, however, since the attorney is considered the petitioner's agent when acting, or failing to act, in furtherance of the litigation, the petitioner must "'bear the risk of attorney error.'" *Coleman v. Thompson*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. at 488).

Petitioner has not demonstrated legal cause for his procedural default of this claim.  Since he cannot establish such cause, this Court need not decide whether he also suffered actual prejudice as to

---

[13] This final exception, however, is intended for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *see also Lebron v. Mann*, 40 F.3d 561, 564 (2d Cir. 1994).

this claim because federal habeas relief on the basis of a procedurally defaulted claim is unavailable unless **both** cause and prejudice are demonstrated.  *See, e.g.*, *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Pou v. Keane*, 977 F. Supp. 577, 581 (N.D.N.Y. 1997) (Kahn, J.) (citing *Stepney*).  Moreover, Johnson has not established that he is actually innocent of any of the crimes of which he was convicted.

Therefore, it is recommended that the Petition be **denied** as to this ground for this procedural reason.[14]

### III.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Petition for a Writ of *Habeas Corpus* (Dkt. No. 1) be **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

---

[14] Even if the Court liberally construed this ground as one claiming there was insufficient evidence to convict him, as stated above, there was more than enough evidence presented at trial to establish that rational triers of fact could have found Petitioner's guilt beyond a reasonable doubt.  *See* Parts I & II.B.  Furthermore, it is interesting to note that Umber's affidavit recanting his testimony came after he was sentenced to forty years to life and did not receive any leniency in sentencing for cooperating in Petitioner's trial.  *See* Resp't Mem. of Law at p. 10, n.3; *see also* Decision and Order, dated Feb. 8, 2001.

Date:   July 23, 2007
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge